IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TONY P. COLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:07cv279-CSC |
| | ) | (WO) |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I. Introduction**

The plaintiff, Tony P. Collins ("Collins"), applied for applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, alleging that he was unable to work because of a disability.[1] His application was denied at the initial administrative level. Collins then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review. The Appeals Council's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[2] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is

---

[1] In his brief, Collins states that he applied for supplemental security income benefits under Title XVI of the Social Security Act 42 U.S.C. § 1381 *et seq.* The record, however, indicates that Collins applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* (R. 26, ¶ 2; R. 51.)

[2] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social

now before the court for review pursuant to 42 U.S.C. § 405 (g) and § 1631(c)(3). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to entry of final judgment by the United States Magistrate Judge. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and this case remanded to the Commissioner for further proceedings.

## II. Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . .

To make this determination,[3] the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. § 404.1520, §416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative

---

Security matters were transferred to the Commissioner of Social Security.

[3] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. Administrative Proceedings

Collins was 49 years old at the time of the hearing before the ALJ. (R. 353.) He has received a General Education Degree. (R. 356.) Collins' prior work experience includes

---

[4] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

3

work as a hair stylist, off loader, cashier, general accounting clerk, convenience store manager, and sewing floor supervisor. (R. 373-77.) Collins alleges that he became disabled due to residual pain from orthopedic injuries following an automobile accident, including back and hip pain and numbness, sleep apnea, emphysema, mitral valve prolapse, and HIV. (R. 101, 352.) Following the administrative hearing, the ALJ concluded that Collins has severe impairments of HIV, sleep apnea, and orthopedic impairment secondary to a motor vehicle accident. (R. 28.) The ALJ also determined that Collins is unable to perform his past relevant work, but that he retains the residual functional capacity to perform sedentary work. (R. 31.) Based on the testimony of a vocational expert, the ALJ concluded that there were a significant number of jobs existing in the national economy that Collins could perform, including work as an assembler, charge account clerk, or telephone solicitor. (R. 32.) Accordingly, the ALJ concluded that Collins was not disabled. (R. 33.)

### IV. The Issues

In his brief, Collins raises the following claims:

(1) The ALJ erred as a matter of law by totally rejecting the opinion of Laurie Dill, M.D., Collin's treating physician at Copeland Care Clinic, Montgomery AIDS Outreach.

(2) The ALJ erred as a matter of law in determining that Collins has "no established side effects from any medication that would interfere with his ability to perform the jobs identified by the vocational expert" and that the record was devoid of any objective evidence to substantiate Collins' allegations of severe pain.

(3) The ALJ erred as a matter of law by failing to order an

>> orthopedic consultative evaluation where Collins alleged very
>> serious orthopedic problems.

(Doc. No. 14, p. 3.)

### V. Discussion

Collins raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of Collins' specific arguments because the court concludes that the ALJ erred as a matter of law, and thus, this case is due to be remanded for further proceedings. Specifically, the court finds that the ALJ failed to fully develop the record concerning Collins' orthopedic impairments and failed to properly consider his inability to afford medical treatment.

Collins complains that the Commissioner failed to properly evaluate and credit his subjective complaints of pain. "Subjective pain testimony supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the plaintiff complains is itself sufficient to sustain a finding of disability." *Hale v. Bowen*, 831 F.2d 1007 (11th Cir. 1987). The Eleventh Circuit has established a three-part test that applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. *Landry v. Heckler,* 782 F.2d 1551, 1553 (11th Cir. 1986); *see also Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). This standard requires evidence of an underlying medical condition *and either* (1) objective medical

5

evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain. *Landry,* 782 F. 2d at 1553.

Collins alleges that he suffers pain as a result of injuries sustained in a car accident in 2002. Collins testified that he suffers from "pretty much constant" pain running from his upper hip and down to his toes along his right side; however, he also stated that, at various times, he "can get out of the pain and relieve it" by resting his leg and foot. (R. 362-63.) Collins indicated that sitting, standing, or riding in a vehicle causes the pain to worsen. (R. 363.) He further testified that he only takes prescribed pain medication when the pain becomes excruciating and he "get[s] to the point that [he's] in tears." (*Id*.) Collins alleged that he takes Darvocet approximately three times a week and that he usually takes twice the recommended dosage because one tablet is not effective. (R. 363-64.) During the hearing, Collins removed his slipper and described the pain in his foot and knee as follows:

> [O]n the bottom of my foot they put three pins right through these joints here. The pins froze my – the fourth toe into a position. . . . I walk on the ball of this joint here and because this toe has been repositioned in an up state, my small toe has come over underneath and this is a pressure point. That's what is causing a lot of the pain in my foot. Also, when I stand for very long periods of time, this big knot on the side of my foot here – at night when I finally do get a change to get off of it . . . it starts radiating pains so excruciating, you just cannot believe how bad that knot right there causes pain. But this and there – this toe – I don't know if it will ever more [*sic*] again, but that's the pressure point, too – like I said. But the pains start down here, work its way into the ball of my foot here and then the heel into my ankle. But there's time that it just shoots and radiates pain all the way around my ankle and it starts swelling. And on

> up into . . . my knee. The two screws that are here on each side
> . . . . When I lay down at night, it's impossible . . . to turn over
> on my right side, this pushes so badly against these screws here
> and here, I'll come out of a dead sleep just that fast because of
> the pain being so bad. . . ."

(R. 370-71.) He also testified that the screws in his pelvic bone cause him to suffer pain. (R. 371.)

The medical records demonstrate that Dr. Laurie Dill, an internist at Copeland Care Clinic, began treating Collins at some point after he was diagnosed with HIV in 1999. (R. 302.) On or around August 14, 2002, Collins was involved in a head-on motor vehicle collision. On that day, Collins was transferred from Edge Regional Medical Center to UAB Hospital for surgery, where Dr. Jorge E. Alonso conducted the following operations: (1) open reduction and internal fixation of right acetabulum, both columns; (2) open reduction and internal fixation of distal femoral fracture; (3) repair of patellar tendon, right patella; and (4) pinning of second, third, and fourth metatarsals. (R. 186, 214-15.) Collins was discharged from the hospital on August 28, 2002. (R. 214.) Shortly afterward, Dr. Alonso referred Collins to an aggressive physical therapy program. (R. 224-25.) During each follow-up visit, Dr. Alonso noted that Collins' condition steadily improved. (R. 222-23, 225.) At some point on or around September 2002, the pins in Collins' foot were removed by another physician at a clinic in Selma due to "drainage of the pin tracks." (R. 225.) On November 12, 2002, Dr. Alonso noted "some displacement of the 2nd and 3rd metatarsal heads" and referred Collins to "Dr. Thomas to be evaluated for his foot injury." (R. 224.) On January 14, 2003, Dr. Alonso

further noted that Collins has "done remarkably well" and that his "main complaint is his hip and all the injured areas since he has gone back to work full time." (R. 223.) Dr. Alonso also determined that Collins "has some arthritic changes already and some other problems with his hip," but that he has also has full range of motion of the hip (*Id.*) On March 23, 2003, Dr. Alonso again determined that Collins was doing "remarkably well" with full range of motion and no pain or tenderness. (R. 222.) Dr. Alonso, however, also noted that Collins complained that the screws in his knee were protruding on the medial side and advised that "if it continues we can remove the screws from the distal femur." (*Id.*) Between September 2002 and January 2004, Dr. Alonso routinely prescribed pain medication, including Ultram, Tramadol,[5] Propoxyphene Napsylate,[6] and Hydrocodone.[7]

On July 8, 2004, Collins was admitted to Enterprise Medical Center with complaints that his "right side hurts and [his] leg bothers [him] some." (R. 246.) Dr. Douglas Haas Jones noted that Collins "denies any gait or balance trouble, no knee or ankle joint instability." (*Id.*) Dr. Jones assessed that, with respect to Collins' extremities, "[t]here is a terrace degree of nontender, nonpitting peripheral edema on the right and a very minimal degree of tenderness when palpating firmly over the ankle, which up to the distal one-third of the lower leg is a fine

---

[5] Ultram, also known as Tramadol Hydrochloride, are indicated for the management of moderate to moderately severe pain. Physicians' Desk Reference 53rd ed. (1999) at p. 2255.

[6] On January 13, 2004, Collins received a prescription for 100 tablets of Propoxyphene Napsylate, the generic version of Darvocet -N, which is indicated for the relief of mild to moderate pain. Physicians' Desk Reference 53rd ed. (1999) at p. 1567.

[7] Hydrocodone is a semi-synthetic narcotic analgesic and antitussive. Physicians' Desk Reference 62nd ed. (2008) at p. 510.

degree of erythema that is only mildly warm. . . . The dorsum of the foot is with a very minimal degree of erythema but no palpable abnormality otherwise. . . . Sole is unremarkable." (R. 247-48.) Dr. Jones diagnosed Collins as suffering from "right lower extremity cellulitis with leukocytosis and improved right mid and upper quadrant abdominal pain and myalgia." (R. 248.) Upon discharge four days later, Collins "denie[d] any right leg pain and indicate[d] that his leg [was] noticeably less swollen, less erythematous and without myalgia." (R. 244.)

Dr. Dill continued treating Collins on a monthly basis for his HIV condition at the Copeland Care Clinic. At some point in 2004, she also began treating him for his complaints of residual pain. On August 23, 2004, Dr. Dill noted that Collins complained of increased back and right leg pain. (R. 294.) She also noted that Collins indicated that he was unable to afford surgery to have "nails" removed from his right knee or additional surgery on his right foot. (R. 294.) Dr. Dill prescribed 20 tablets of Darvocet-N to be used as needed for breakthrough or severe pain. (*Id.*) On October 25, 2004, Dr. Dill assessed that Collins suffered from second-degree pain due to leg or gait problems and recommended Advil. (R. 291.) Between February 2005 and September 2005, Dr. Dill routinely prescribed pain medication, including Hydrocodone and Propoxyphene Napsylate,[8] to treat Collins' complaints of pain. On May 16, 2005, Collins complained of trouble sleeping and increased

---

[8] On January 13, 2004, Collins received a prescription for 100 tablets of Propoxyphene Napsylate, the generic version of Darvocet -N, which is indicated for the relief of mild to moderate pain. PDR 1999, p. 1567.

9

"pain from althralgias" secondary to his motor vehicle accident and reported that he had used all of his pain medication. (R. 326) Dr. Dill prescribed Lortab 2.5/500 to be taken once a day. (R. 324.) On December 1, 2005, Dr. Dill noted that Collins complained of increased right foot pain and that he was unable to stand or walk for long periods of time. (R. 309.) On December 2, 2005, Dr. Dill submitted a letter, in which she states:

> . . . [Collins] was diagnosed with HIV in 1999. I am his HIV physician. He is also diagnosed with Mitral Valve Prolapse, sleep apnea, emphysema, and has worsening chronic problems with severe pain from right knee, leg, and foot due to a motor vehicle accident in 2002 with multiple fractures, requiring surgeries and a prolonged hospitalization. Since he has not had medical insurance to continue with his care at UAB for these orthopedic problems they have worsened to the point he can no longer stand or walk well, or work. . . .

(R. 302.)

The ALJ, however, found that the record does not confirm Collins' complaints of pain. Specifically, the ALJ determined:

> In regard to pain it is noted that the claimant testified that he was using Darvocet as needed three times a week. This limited use of medication is inconsistent with the significant pain the claimant alleges that he experiences. In fact, the objective findings of record do not support the claimant's testimony of extreme symptoms and limitations.
>
> The claimant's treatment for HIV seems effective given his documented laboratory results and consistent reports by his treating physician indicating he is doing well. Also the claimant's treatment for his orthopedic impairment seems fairly effective given the level of pain medication he uses. The claimant's testimony would indicate failure of his medical treatment, but he is not fully credible.
>
> The claimant suffers no established side effects from any

>medication that would interfere with his ability to perform jobs identified by the vocational expert. Also the claimant minimizes his activities of daily living but there is no basis in the record to support such restrictions.
>
>Dr. Dill indicated on December 2, 2005, that the claimant was diagnosed with HIV in 1999. She noted that the claimant was also diagnosed with mitral valve prolapse, sleep apnea, emphysema, and worsening chronic problems with severe pain from his right knee, leg and foot due to a motor accident in 2002. Dr. Dill indicated that since the claimant has not had any medical insurance to continue with his care at UAB for orthopedic problems, they have worsened to the point that he could no longer stand or walk well, or work. . . . The undersigned totally rejects this opinion by Dr. Dill as it is not supported by the record. Dr. Dill seems to base the opinion of disability on an orthopedic impairment causing the claimant to no longer stand or walk well, or work. She points out that the claimant has no insurance, but Dr. Dill's own treatment records and the limited use of pain medication do not support her opinion of disability. The treatment records do not indicate that the claimant had complaints of significant problems to an orthopedic impairment. In fact, when the claimant did have insurance the treatment records through July 2004 consistently indicate that he reported feeling well, which does not support orthopedic disability or any other basis for disability.

(R. 31.)

The ALJ discredited Collins' pain testimony, determining that his limited use of medication is inconsistent with the significant pain alleged and that the objective findings of record do not support the his testimony of extreme symptoms and limitations. First, the court questions whether the ALJ's determination that Collins' use of pain medication is "limited" is supported by substantial evidence. During the hearing, Collins testified that he "doubles up" on the medication at least three times a week. Thus, Collins takes twice the recommended dosage on each occasion that he takes Darvocet. In addition, the medical records indicate that

11

physicians have consistently prescribed Darvocet and other pain killers on a routine basis since Collins' car accident.

Secondly, Collins has been unable to afford medical treatment, such as pain medication[9] or an examination by an orthopedic specialist, since on or around August 2003. While failure to seek treatment is a legitimate basis to discredit the testimony of a claimant, it is the law in this circuit that poverty excuses non-compliance with prescribed medical treatment or the failure to seek treatment. *Dawkins v. Bowen*, 848 F.2d 1211 (11th Cir. 1988). During the hearing, Collins testified that he has no income and cannot afford health insurance. (R. 356, 358.) On August 23, 2004, Collins' treating physician noted that Collins "needs 'nails' removed rt knee but can't afford, needs additional surgery rt ft but owes UAB money → bankruptcy - can't afford surgery, taking 25 mg Vioxx qd, but only taking prn 2° can't afford, & taking ÷ Darvocet prn severe pain - takes qd 2-3 x1wk for [increased] pain." (R. 294.) Thus, the medical records indicate that Collins limited his usage of anti-inflammatory and pain medication due to his inability to afford prescription medication. When determining that Collins' limited use of pain medication and the lack of medical records indicating he complained of significant problems due to an orthopedic impairment establishes that his allegations of severe pain are not credible, the ALJ failed to consider whether Collins' financial condition prevented him from seeking medical treatment. Thus, the court concludes that the Commissioner erred as a matter of law in discrediting Collins'

---

[9] Collins testified that his HIV medication is provided by compassionate aid programs. (R. 360.) However, the record indicates that Collins must purchase his pain medication on his own. (R. 303-306.)

allegations of pain based on his reduced usage of prescribed medication and his failure to seek additional treatment for his orthopedic condition.[10]

More importantly, the court concludes that the ALJ failed to fully develop the record concerning Collins' orthopedic condition. Specifically, the ALJ failed to consider whether additional medical evidence concerning Collins' knee and foot problems is necessary. It is error for the ALJ to fail to obtain additional testing or otherwise develop the evidence, if that information is necessary to make an informed decision. *See Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988). While the burden is on Collins to submit evidence establishing disability, the circumstances of this case demand that the ALJ take additional steps to see that the record is fully developed. The medical records indicate that additional surgeries to remove the screws from Collins' knee and correct his foot problem were recommended by his treating physicians. For example, Dr. Alonso recommended an additional procedure to remove screws from Collins' distal femur if he continued to suffer problems. (R. 222.) Dr. Alonso also referred Collins to Dr. Thomas, a foot specialist, to evaluate his foot injury.[11] (R. 224.) Although Dr. Thomas' evaluation is not included in the record, Dr. Dill noted that a UAB physician determined additional surgery on Collins' right foot was necessary. (R. 224,

---

[10] The Government asserts that Collins' testimony that the lack of financial resources impacted his ability to afford treatment should not be considered because "Dr. Jones offered him his services in the clinic and provided him with free samples of medications." (Doc. No. 17, p. 9.) The Government's contention includes a mis-characterization of the evidence. Although the record indicates that Dr. Jones, an internist, noted that "as patient does reside in Enterprise and does not have a local primary care provider, I offered him my services in the clinic and he appreciates that. . . ," nothing in Dr. Jones' notes indicates that he offered his services gratuitously.

[11] The court notes that Dr. Thomas' medical records are not included in the record. On remand, the ALJ may further develop the record by obtaining Dr. Thomas' evaluation of Collins' foot condition.

294.) Despite medical evidence suggesting that Collins required additional surgical procedures, the ALJ failed to order a consultative examination to determine whether Collins' failure to undergo additional recommended surgery due to his inability to afford treatment has caused his condition to worsen or otherwise increased his pain.

Despite evidence indicating that Collins cannot afford treatment for his orthopedic conditions and the absence of a consultative examination, the ALJ rejected Dr. Dill's opinion that Collins' condition "worsened to the point that he could no longer stand or walk well" and concluded that "the objective findings of record do not support the claimant's testimony of extreme symptoms and limitations." (R. 31.) In doing so, the ALJ substituted his judgment for that of a medical specialist. This he cannot do. *See Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). The ALJ is not free to simply ignore medical evidence, nor may the ALJ pick and choose between the records selecting those portions which support his ultimate conclusion. Because the ALJ failed to fully develop the record by ordering a consultative examination or securing additional medical records, the court cannot conclude that the ALJ's rejection of Dr. Dill's opinion is supported by substantial evidence.

Based on the foregoing, the court concludes that the ALJ erred as a matter of law. Specifically, the court finds that the ALJ failed to properly consider Collins' financial inability to secure prescribed medication and other medical treatment for his orthopedic conditions and failed to fully develop the record by obtaining a consultative examination with an orthopaedic specialist to evaluate his complaints of knee and foot pain. Therefore, it is impossible for the court to determine whether the Commissioner's decision to deny benefits

was rational and supported by substantial evidence. The court therefore concludes that this case is due to be remanded.

## V.  Conclusion

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate order will be entered.

Done this 31st day of January, 2008.

        /s/Charles S. Coody
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

**1.** **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

  (a) **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

  (b) **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

  (c) **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

  (d) **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

  (e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

Rev.: 4/04

2. **Time for Filing**: The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

   (a) **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

   (b) **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

   (c) **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

   (d) **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

   (e) **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal:** Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).